ANGIODYNAMICS, INC., Plaintiff,

v.

**BIOLITEC AG, Wolfgang Neuberger, Biolitec, Inc., and Biomed Technology Holdings, Ltd., Defendants.**

C.A. No. 09–cv–30181–MAP.

United States District Court,
D. Massachusetts.

April 11, 2013.

Order Denying Motion for Relief from Judgment Aug. 27, 2013.

Colm P. Ryan, William E. Reynolds, Bond, Schoeneck & King PLLC, Albany, NY, for Plaintiff.

Edward Griffith, The Griffith Firm, New York, NY, Erika C. Browne, Segel, Goldman, Mazzotta & Siegel, P.C., Albany, NY, Michael K. Callan, Doherty, Wallace, Pillsbury & Murphy, P.C., Springfield, MA, Paul A. Feigenbaum, Mazzotta, Siegel & Vagianelis, P.C., Albany, NY, for Defendants.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S EMERGENCY MOTION FOR CONTEMPT*
(Dkt. No. 205)

PONSOR, District Judge.

## I. INTRODUCTION

This case originally arose out of a private commercial dispute between the par-

ties. Over the last month, however, the case has turned into a challenge to the very foundation of the rule of law. Defendants Wolfgang Neuberger, Biolitec AG ("BAG"), and Biomed Technology Holdings, Ltd. ("Biomed") flagrantly and intentionally violated a preliminary injunction issued by this court.[1] Plaintiff brought this motion for civil contempt in response to Defendants' notice to the court that they had completed the action forbidden by the preliminary injunction. The court will enter coercive sanctions to ensure Defendants' prompt compliance with the order. These coercive sanctions will remain in place until Defendants effectively restore the parties to the status quo ante. The court will also refer this case to the United States Attorney for prosecution for criminal contempt.

## II. *BACKGROUND*

For purposes of this motion, the court has no need to go into the detailed relationship among the parties and the substance of the private commercial dispute. That material has been extensively outlined in prior decisions. *AngioDynamics, Inc. v. Biolitec, Inc.,* 2011 WL 3157312, *1–2 (D.Mass. July 25, 2011); *AngioDynamics, Inc. v. Biolitec AG,* 910 F.Supp.2d 346 (D.Mass.2012). However, a brief background of the events leading up to the motion at hand is required.

In August 2012, Plaintiff became aware that Defendant BAG planned to complete a merger with its Austrian subsidiary entity, Biolitec Unternehmensbeteiligungs I AG ("BUIAG"). Defendant BAG set a shareholders' meeting for August 30, 2012, to vote on the proposed merger of BAG into BUIAG. Following the proposed merger, the new entity would hold all as-

sets and liabilities previously held by BAG, and shareholders in BAG would have their shares converted into shares of the new entity. BAG publicly announced that the 75% ownership share of Defendant CEO Wolfgang Neuberger in BAG guaranteed that his plan would be approved by a majority of the shareholders.

Plaintiff filed for a preliminary injunction to prevent Defendants from completing the merger. Plaintiff alleged that the merger would place BAG's assets out of its reach, as American judgments are unenforceable in Austria. On August 29, 2012, Judge Zobel granted Plaintiff's Motion for a TRO and Preliminary Injunction to bar this merger. The injunction restrained Defendants from:

- "carry[ing] out the proposed 'downstream merger' of Biolitec AG with its Austrian subsidiary;

- "alienat[ing], dispos[ing] of, sell[ing] dissipat[ing], encumber[ing], or otherwise transfer[ing] any ownership interest it holds in any other defendant during the duration of this Order; and

- "alienat[ing], dispos[ing] of, sell[ing] dissipat[ing], encumber[ing], or otherwise transfer[ing] any interest it may have in any property during the duration of this Order, except that this Order shall not preclude the defendants from taking such actions as are reasonable and necessary to the ongoing and continued operation of the business of Biolitec, Inc., Biolitec AG, and Biomed Technology Holdings, Ltd. in the ordinary course of business, including the payment of reasonable attorneys' fees for the provision of legal services; and ex-

---

1. Defendant Biolitec, Inc. has filed for Chapter 11 bankruptcy, and the contempt proceed- ings do not involve this defendant.

cept that this Order shall not apply to the reasonable and necessary personal and living expenses of defendant Wolfgang Neuberger."

(Dkt. No. 126.) The injunction further restrained, with minor exceptions, Defendants' use of their property pending a further order of this court.

On September 6, 2012, defense counsel informed the court that, despite Judge Zobel's order, Defendant BAG had proceeded with the shareholders' meeting and vote. (Dkt. No. 133 ¶ 5.) Defendants did not inform the minority shareholders of the TRO. (Dkt. No. 136–1, Sept. 10, 2010 Reynolds Decl. ¶ 11.) Given Defendant Neuberger's three-quarter share in the company, it was not surprising that the vote in favor of the merger passed by a wide margin.

The convening of the shareholders' meeting and the vote in favor of the merger, in the teeth of the preliminary injunction, raised troubling questions about Defendants' good faith. Their argument in opposition to the issuance of the preliminary injunction was anchored on their contention that the injunction would bar the meeting and vote, yet they immediately proceeded with the vote right after the injunction issued. Reassured by Defendants that the vote in favor of the merger did not, technically, effectuate the merger, and that Defendants still intended to hold off on the merger out of respect for the injunction, this court concluded that, since the formal merger of BAG into the Austrian entity had not occurred, no outright violation of the preliminary injunction had taken place.

On September 13, 2012, after hearing oral argument, this court reaffirmed the preliminary injunction entered by Judge Zobel. (Dkt. No. 141.) Defendants moved for reconsideration of the preliminary injunction and requested an evidentiary hearing. (Dkt. No. 144.) The court declined the request to reconsider the preliminary injunction and hold an evidentiary hearing on December 14, 2012, in a lengthy decision justifying the issuance of the preliminary injunction. *AngioDynamics, Inc. v. Biolitec AG,* 910 F.Supp.2d 346 (D.Mass.2012).

Defendants immediately appealed the preliminary injunction to the First Circuit asking for expedited resolution and also requesting that the First Circuit modify the preliminary injunction pending the appeal pursuant to Fed.R.Civ.P. 8(a)(2). On February 4, 2013, the First Circuit denied Defendants' motion for modification. Defendants then filed in this court an emergency motion to vacate the order pursuant to Fed.R.Civ.P. 60(b)(2). (Dkt. No. 190) That motion was also denied for failure to raise sufficient new evidence to justify altering the preliminary injunction. (Dkt. No. 195)

Despite the continued affirmance of the preliminary injunction by this court and the First Circuit, Defendants notified this court on March 15, 2013, that:

> Biolitec AG's downstream merger with its Austrian subsidiary has been completed pursuant to the direction of Biolitec AG's Supervisory Board. The merger was completed [on] March 15, 2013, when the Commercial Court of Vienna approved registration of the merger in Austria.

(Dkt. No. 199, Defs.' Notice of Completion of BAG's Downstream Merger 1.)

Unsurprisingly, this concession prompted Plaintiff to file the current emergency motion for contempt.

On April 1, the First Circuit heard oral arguments on Defendants' expedited appeal. In an unusually prompt turnaround, the First Circuit upheld the preliminary injunction on the same day. Two days

later, this court heard oral arguments on Plaintiff's motion for contempt. At that hearing, this court ordered individual Defendant Neuberger to appear in person at a hearing on April 10 to show cause why he should not be held in civil or criminal contempt.

In direct defiance of the court's order to personally appear, Defendant Neuberger notified the court that he would not attend the show-cause hearing because he was "afraid that the Court may grant ADI's request to incarcerate him until Biolitec AG relocates its corporate domicile back to Germany." (Dkt. No. 243.)

## III. *DISCUSSION*

### A. *Civil Contempt.*

■ Courts have the inherent power to sanction for contempt. The contempt power is a potent one. *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967); *In re Grand Jury Investigation*, 545 F.3d 21, 25 (1st Cir.2008). Because of its potency, the First Circuit has emphasized prudential principles to be considered when a court deploys sanctions for contempt. *In re Grand Jury Investigation*, 545 F.3d at 25.

■ To prove civil contempt, a movant must show with clear and convincing evidence that "(1) the alleged contemnor had notice of the order, (2) the order was clear and unambiguous, (3) the alleged contemnor had the ability to comply with the order, and (4) the alleged contemnor violated the order." *Hawkins v. Dept. of Health & Human Serv.*, 665 F.3d 25, 31 (1st Cir.2012) (internal quotations and citation omitted).

■ Plaintiff can easily make out each of these elements with clear and convincing evidence from the record. First, Defendants had notice of the order as parties to the case when Judge Zobel entered the temporary restraining order and this court reaffirmed the order and issued a preliminary injunction. (Dkt. Nos. 126 and 141.)

Second, the order could not have been more clear and unambiguous. The first requirement in the order for preliminary injunction was that "Defendants shall not carry out the proposed 'downstream merger' of Biolitec AG with its Austrian subsidiary." (Dkt. No. 141.) The court also repeatedly told Defendants "that the merger should not take place, and [the court] expect[s] that that order will be adhered to." (Dkt. No. 142, Tr. Mot. Hearing 94.)

Third, Defendants repeatedly assured the court that they could and would comply with the order to not carry out the proposed downstream merger. When questioned about the effect of the shareholder vote, Defendants identified several additional actions that would have to be taken to effectuate the merger: (1) the execution of a formal Notice of Merger by Defendant Neuberger which would then be filed with the German commercial register (Dkt. No. 144–2, Gebhardt Decl. ¶ 9); (2) filing an application for registration of the Planned Merger in an Austrian court (Dkt. No. 179–1, Trettnak Decl. ¶ 3); (3) filing a certificate of approval from the German court in the Austrian court (Dkt. No. 179–1, Trettnak Decl. ¶ 10). Defendants also asserted that they could withdraw their application to register the merger from the Austrian court. (Dkt. No. 179–1, ¶ 4, 9.) In carrying out the downstream merger, Defendants had to make conscious decisions to take each of the steps that they identified to propel the merger forward in defiance of the injunction.

Finally, the movant must show that Defendants violated the order. This prong often requires courts to grapple with evi-

dentiary issues of compliance. Here the court is presented with no such difficulties. Defendants themselves filed a notice with this court that it completed "Biolitec AG's downstream merger with its Austrian subsidiary." (Dkt. No. 199, Notice of Merger 1.) Defendants also acknowledged that the text of the order prohibited this action. (*Id.*)

Defendants attempt to argue that they have complied with the preliminary injunction because "completion of the merger did not violate the stated purpose of [the] Preliminary Injunction." (Dkt. No. 199, Notice of Merger 2.)

■ Defendants' attempt to argue compliance by referring to the general purpose of the injunction while conceding that they violated the text is a non-argument. In determining whether an order is unambiguous enough to justify civil contempt, the First Circuit has demanded that courts look to "the four corners of the order [to ascertain] what acts are forbidden" and the inquiry is limited "to an examination of that document's text." *Goya Foods*, 290 F.3d at 76. The text of a court order determines its power over parties. To allow parties to independently deduce the purpose of a court order and determine what acts would be most in line with the purpose—regardless of the text—would make this court irrelevant. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911).

Additionally, Defendants' rationalization of its contemptuous behavior is an attempt to re-litigate the finding by this court that Plaintiff would be irreparably harmed by the merger. Defendants extensively argue that Plaintiff has not been harmed by the merger because Defendants believe that Plaintiff still can enforce a potential judgment in Germany. Two district court judges rejected Defendants' arguments in entering the TRO and then preliminary injunction. This court again rejected these arguments on motions for reconsideration and modification. The First Circuit rejected these arguments on motions for modification and direct appeal. There is no doubt that the preliminary injunction that constrained the merger was valid and that Defendants had ample opportunity to present their objections.

Even if Defendants effectuated the downstream merger in a good faith effort to allow Plaintiff to enforce a judgment in Germany that would not absolve them of a finding of civil contempt. The First Circuit has made clear that good faith is not a defense to civil contempt. *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir.2002). "An act does not cease to be a violation of ... a decree merely because it may have been done innocently." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

The violation of a court order may be punished simply as a violation of the text alone—when a defendant is in good faith, and even when a plaintiff is not harmed. But, it is worth observing here, Plaintiff has argued, and the court agrees, that Defendants in fact violated this court's injunction, now affirmed by the First Circuit, in every way it could be violated: text, substance, spirit, body, and soul. Moreover, as the court found, despite Defendants' arguments, the effectuation of the merger has likely harmed Plaintiff, and this harm to Plaintiff—the placement of Defendants' assets outside the reach of Plaintiff in the likely event that Plaintiff

recovers judgment—was precisely the reason that Defendants went forward with their contumacious behavior. In other words, while Defendants' bad faith may be legally irrelevant, the record strongly supports the conclusion that bad faith was at the heart of Defendants' conduct and motivated their decision deliberately to defy the court's order.

The effectuation of the downstream merger by Defendants BAG, Biomed, and Wolfgang Neuberger—in the face of explicit reassurances to this court orally and in writing that Defendants intended to comply—constitutes the most flagrantly offensive violation of a court order that this court has personally encountered. There can be no debate that all four of the prudential criteria that inform a court's consideration of a motion for civil contempt have been satisfied by clear and convincing evidence. The only question remaining is what remedy the court can craft to sanction the civil contempt.

■ Courts can craft civil contempt sanctions either to coerce compliance with the court's order or compensate a movant for losses sustained from the violation of the court order. *Hawkins*, 665 F.3d at 32 (internal quotation and citation omitted). Here, the court has a responsibility to the system of law it upholds to move quickly to craft sanctions to coerce Defendants to restore the status quo ante.

■ "[W]here the purpose [of the sanction] is to make the defendant comply, the court[ ] ... must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the results." *United States v. United Mine Workers of America*, 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947). While Defendants have undoubtedly already taken an action that was forbidden by the order, the record is clear that this action can be undone through a determined, good faith effort. At the oral arguments, counsel for Defendants outlined the steps that would have to be taken to restore the status quo ante. It may indeed be impossible, as Defendants' counsel suggested, technically to "rescind" the merger at this time. The court makes no finding on this point, beyond the observation that Defendants' general credibility about what it can or cannot do is subject to doubt. In any event, Defendants concede that restoring the status quo ante would in fact not be impossible, but merely lengthy,[2] burdensome, and onerous.[3] (Dkt. No. 233, April 3 Hearing Tr. 36.)

■ "A trial court has wide discretion in its choice of sanctions." *Goya Foods*, 290 F.3d at 77. This is particularly true when the court is attempting to coerce compliance. *United Mine Workers of America*, 330 U.S. at 304, 67 S.Ct. 677; *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 41 (1st Cir.

2. In one filing, Defendants contend that "the process would take at least several months." (Dkt. No. 241, Emergency Mot. for Video Link Appearance ¶¶ 2, 3.)

3. The possibility of restoring the status quo ante makes this case distinguishable from cases where an action could not be undone. Coercive measures are inappropriate when the action cannot be undone. *See Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911). When an enjoined protest or boycott takes place, for example, or an enjoined representation is published, a court could never effectuate a return to the status quo ante. But in the case before the court, Defendants concede that it is possible to restore the status quo ante even though it would be difficult. When sanctions are tied to *"curing* the contumacy," they are properly considered civil remedies. *See Marquardo*, 149 F.3d at 40.

1980). The court can order incarceration to insure acquiescence to a court's order. *United States v. Marquardo*, 149 F.3d 36, 39 (1st Cir.1998). The court can also order a monetary fine. *G. & C. Merriam Co.*, 639 F.2d at 41.

 The court orders the following coercive sanctions until Defendants effectively return Biolitec AG to the status quo ante:

- An arrest warrant will be issued for the arrest of Defendant Wolfgang Neuberger. The court asks the marshals to do everything possible to ensure that the warrant is effectuated internationally and Neuberger is brought to stand before this court;

- A fine will be assessed to Defendants. The fine will increase over time as follows:

 - On May 10, 2013, Defendants will be assessed a fine of $1 million;

 - On June 1, 2013, Defendants will be assessed a fine of $2 million;

 - On July 1, 2013, Defendants will be assessed a fine of $4 million;

 - On August 1, 2013, Defendants will be assessed a fine of $8 million;

 - After August 1, Defendants will be assessed a fine of $8 million on the first of each month.

Defendants "have the keys [to their] prison in their own pockets." *Marquardo*, 149 F.3d at 39 (quoting *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)). The coercive fines and arrest warrant (or imprisonment, when Defendant Neuberger is apprehended) will be lifted as soon as the court is satisfied that the status quo ante has been restored.

In addition to the sanctions detailed above, Plaintiff's counsel may submit a motion with a supporting affidavit and con-temporaneous time records for an award of attorneys' fees expended in prosecuting the motion for civil contempt.

### B. Criminal Contempt.

 "[O]nce the subject of an order willfully refuses to meet the court's order, criminal contempt has been committed independently of whether this conduct receives the additional attention of the court [through civil contempt]." *Marquardo*, 149 F.3d at 40. Defendant Wolfgang Neuberger has willfully refused to comply with two orders by this court: (1) the order enjoining the downstream merger (Dkt. No. 141); and (2) the order to appear personally to show cause (Dkt. No. 231). While Defendant Neuberger offers rationalizations for his noncompliance, there is no doubt from the record that these actions were taken willfully.

[14] The court has provided Defendant Neuberger with notice in open court and an opportunity to show cause pursuant to Fed.R.Crim.P. 42(a)(1). The court will now request that the United States Attorney's Office prosecute the criminal contempt. "[C]riminal contempt proceedings ... punish those who willfully flout an order of the court.... [Defendant] made a deliberate decision to refuse a court order ..., [he] now must face the consequences of that decision." *United States v. Nightingale*, 703 F.2d 17, 19 (1st Cir.1983).

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's emergency motion for contempt (Dkt. No. 205) is hereby ALLOWED. The court has issued an arrest warrant for Defendant Wolfgang Neuberger for civil contempt and will refer the matter to the United States Attorney's Office for criminal contempt prosecution. The following coercive fines will also be levied:

- On May 10, 2013, Defendants will be assessed a fine of $1 million;

- On June 1, 2013, Defendants will be assessed a fine of $2 million;

- On July 1, 2013, Defendants will be assessed a fine of $4 million;

- On August 1, 2013, Defendants will be assessed a fine of $8 million;

- After August 1, 2013, Defendants will be assessed a fine of $8 million on the first of each month.

The fines and incarceration for civil contempt will continue until Defendants effectively restore the status quo existing prior to the violation of the court's order.

It is So Ordered.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' AMENDED MOTION FOR RELIEF FROM CONTEMPT ORDER; DEFENDANTS' MOTION FOR RECUSAL, AND DEFENDANTS' MOTION TO VACATE PRELIMINARY INJUNCTION (Dkt. Nos. 269, 274, 277)

### I. INTRODUCTION

Defendants Biolitec AG ("BAG"), Biomed Technology Holdings Ltd. ("Biomed"), and Wolfgang Neuberger[1] have filed a motion for relief from the contempt order issued against them (Dkt. 269), a motion for recusal (Dkt. 274) and a motion to vacate the preliminary injunction (Dkt. No. 277) issued by this court. This injunction, affirmed on appeal by the First Circuit, barred Defendants from proceeding with a merger of BAG, a German corporation, with its Austrian subsidiary. For the reasons set forth below, all these motions will be denied.

### II. FACTS

The complex background underlying this litigation has been detailed in a number of prior decisions. *AngioDynamics, Inc. v. Biolitec, Inc.*, 2011 WL 3157312, *1–2 (D.Mass. July 25, 2011); *AngioDynamics, Inc. v. Biolitec AG*, 910 F.Supp.2d 346 (D.Mass.2012). The facts supporting the court's civil contempt order and its referral of the case to the United States Attorney for possible initiation of charges for criminal contempt are set forth at length in the order of April 11, 2013. *AngioDynamics, Inc. v. Biolitec AG*, 946 F.Supp.2d 205, 2013 WL 1567739 (D.Mass.2013). The journey of this case has been somewhat tortuous, but the rulings on Defendants' three motions do not require a lengthy rehashing, beyond, as will be seen, a few basic facts.

This phase of the dispute largely centers on the preliminary injunction issued by this court on September 13, 2012. (Dkt. No. 141.) The order enjoined Defendants from "carry[ing] out the proposed 'downstream merger' of [BAG] with its Austrian subsidiary." (*Id.*) The injunction was upheld on reconsideration by this court and, as noted, upon subsequent appeal to the First Circuit. *AngioDynamics, Inc. v. Biolitec AG*, 910 F.Supp.2d 346 (D.Mass. 2012); *AngioDynamics, Inc. v. Biolitec AG*, 711 F.3d 248 (1st Cir.2013). On March 15, 2013, Defendants notified the court that, in the teeth of the injunction, they had knowingly and intentionally proceeded with the enjoined merger anyway, and it had been completed. (Dkt. No. 199.)

On April 10, 2013, after a show cause hearing, the court ordered that Plaintiff's request for initiation of possible criminal contempt proceedings against the individu-

---

1. Defendant Biolitec, Inc. has filed for Chapter 11 bankruptcy, and the contempt proceed- ings do not involve this defendant.

al defendant Neuberger be referred to the United States Attorney's Office. The court also found all Defendants in civil contempt and handed down an order designed to coerce Defendants into taking immediate remedial action to bring them into compliance with the preliminary injunction. The court issued an arrest warrant for Defendant Neuberger—who had been invited to attend the show cause hearing to explain his actions but failed to appear—to permit the court to consider appropriate civil sanctions against him personally. In addition, the court established the following schedule of coercive fines intended to compel Defendants to initiate immediate action to return BAG to the status quo as it existed prior to the enjoined merger:

- On May 10, 2013, Defendants to be assessed a fine of $1 million;
- On June 1, 2013, Defendants to be assessed a fine of $2 million;
- On July 1, 2013, Defendants to be assessed a fine of $4 million;
- On August 1, 2013, Defendants to be assessed a fine of $8 million;
- After August 1, Defendants to be assessed a fine of $8 million on the first of each month.

*AngioDynamics, Inc. v. Biolitec AG,* 946 F.Supp.2d at 215, 2013 WL 1567739, at *6. The court noted that the sanctions would be lifted as soon as the court was satisfied that effective actions had been taken to revoke the forbidden merger and restore the status quo ante. *Id.* During the hearing, the court also observed that it would immediately consider any plan offered by Defendants to revoke, eliminate, or in any practical way render nugatory, Defendants' action in defying the court's order and proceeding with the merger. In the event that the plan set Defendants on a clear course to erase the barred merger, the court possessed the power to revoke

the sanctions. (Dkt. No. 248, Tr. Contempt Hr'g 45:4–11.)

More than four months have now passed since the court's finding of contempt. As will be seen below, Defendants appear to recognize that it would be possible, though cumbersome and somewhat time-consuming (a matter of months), to take action that would effectively reverse the merger. Nevertheless, Defendant Neuberger has not appeared, and no plan has been offered by Defendants even to begin to do this. Instead, Defendants have filed a motion for relief from the contempt order (Dkt. No. 269), a motion for recusal (Dkt. No. 274), and a motion to vacate the preliminary injunction (Dkt. No. 277).

## III. *DISCUSSION*

### A. *Relief From the Contempt Order.*

Defendants ask the court to grant them "relief" from the contempt order—essentially, to revoke the order—pursuant to Fed.R.Civ.P. 59(e), 60(b)(4), and 60(b)(6).

■ The request under Rule 59(e) may be quickly disposed of. A motion under this rule "must be filed no later than 10 days after the entry of judgment." Fed. R.Civ.P. 59(e). The court entered its civil contempt order on April 10, 2013; Defendants submitted their first motion for relief (later amended) on May 9, 2013—four weeks after the contempt order was entered and only one day before the fines designed to coerce compliance were to commence. The motion is therefore untimely. In addition, a movant invoking Rule 59(e) must show "manifest errors of law or fact, newly discovered or previously unavailable evidence, manifest injustice, [or] an intervening change in controlling law." *Marie v. Allied Home Mortg. Corp.,* 402 F.3d 1, 7 n. 2 (1st Cir.2005) (quoting 11 Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 2810.1 (2d ed. 1995)). As will be shown in the discussion regarding relief under Rule 60, Defendants could not meet this burden even if their motion under 59(e) was timely.

 Pursuant to Rule 60, Defendants ask the court to provide relief for two reasons: (1) the judgment is void under Rule 60(b)(4); and (2) other reasons justify relief, Rule 60(b)(6). It is well established that relief under Rule 60 is "extraordinary" and that "motions invoking that rule should be granted sparingly." *Karak v. Bursaw Oil Corp.*, 288 F.3d 15, 19 (1st Cir.2002).[2] "At a bare minimum," the moving party must show "that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted." *Id.*

In an attempt to satisfy this standard, Defendants make three main arguments. First, citing *In re Providence Journal Co.*, 820 F.2d 1342, 1347 (1st Cir.1986), Defendants argue that the contempt order is "transparently invalid" because Defendants' violation of the preliminary injunction did not harm Plaintiff. Second, Defendants contend that the civil contempt sanctions are improper because it is not possible for BAG to "restore the status quo ante." Finally, Defendants insist that

the court must make a determination on German law, as well as this law's potential impact upon Plaintiff's future efforts to enforce an American judgment against a now-Austrian corporation, before an enforcement of the preliminary injunction would be appropriate. The failure to do this, Defendants say, vitiates the finding of contempt and the court's remedial order.

#### 1. *Validity of the contempt finding.*

 The centerpiece of Defendants' position is the "no harm, no foul" argument. Yes, Defendants say, we knowingly violated a clear court order, but since (as Defendants seem to suggest, but more about this below) Plaintiff has not been injured, imposition of any painful consequence for their defiance of the court's order would be unfair. Defendants take umbrage at the court's characterization of this argument as childish.[3] The argument is childish. A brief parable demonstrates why.

Suppose an eleven-year-old boy is preparing to throw a snowball at his seven-year-old sister. The parent notices this and warns the boy not to throw the snowball. The boy nods, fully understanding the parent's injunction. As the parent begins to turn away, the boy throws the snowball at his sister anyway. Fortunately, the snowball misses. When the parent points out that there will be consequences for this misbehavior, the child indignantly

---

**2.** The normal route for relief from a contempt order is to prosecute a timely appeal. *Cf. Cotto v. United States*, 993 F.2d 274, 278 (1st Cir.1993) (holding that relief pursuant to Fed. R.Civ.P. 60 cannot be used to circumvent the failure to make a timely appeal). Defendants already appealed the civil contempt order to the First Circuit on May 10, 2013. (Dkt. No. 266, Notice of Appeal.)

**3.** They also express resentment that the court cut off oral argument on this point and suggest the court did not adequately consider it. As the transcript indicates, however, the court "carefully considered" this argument, which was "very forcefully and very clearly" set forth in Defendants' memorandum, prior to oral argument (Dkt. No. 233, Tr. Apr. 3 Hr'g 6:9, 14–5.) It is not necessary for the court to endure an obviously specious argument, or suffer counsel to embarrass himself by presenting one, more than once.

protests that this would be unfair because his sister was not harmed.[4]

This "no harm" argument might be understandable coming from a child, but in the mouth of an adult litigant, or a supposed officer of the court, it is breathtakingly silly. The criteria in this circuit for issuance of a finding of contempt are straightforward. The court must find that:

> (1) the alleged contemnor had notice of the order, (2) the order was clear and unambiguous, (3) the alleged contemnor had the ability to comply with the order, and (4) the alleged contemnor violated the order.

*Hawkins v. Dept. of Health & Human Servs.*, 665 F.3d 25, 31 (1st Cir.2012) (internal quotations and citation omitted). As the court has held, there was, and continues to be, clear and convincing *undisputed* evidence conclusively satisfying each of these requirements. *AngioDynamics, Inc. v. Biolitec AG,* 946 F.Supp.2d at 212–13, 2013 WL 1567739, at *3–4. Defendants, indeed, have effectively conceded that each and every one of these four criteria have been satisfied in this case. As Defendants' counsel admitted: "We violated the preliminary injunction by completing the merger and it's absolutely clear that the preliminary injunction said do not complete the merger." (Dkt. No. 233, Tr. Apr. 3 Hr'g 24:25–25:1–2.)

Defendants, or at least their counsel, must know that once an explicit court order is knowingly and intentionally defied, and the snowball, so to speak, is nevertheless thrown, the moral and legal stage on which the parties and the court act changes substantially. The drama ceases to be only about the Plaintiff; it now bears as much, or more, on the issue of the court's authority and the integrity of the

legal system. Any judge confronting flagrantly contumacious conduct of this sort must either act or take off the robe.

Defendants cite a Fourth Circuit decision that includes language suggesting that in some cases a civil contempt order might include as part of its basis a finding that the "movant suffered harm as a result [of the contumacious conduct]." *Ashcraft v. Conoco, Inc.,* 218 F.3d 288, 301 (4th Cir. 2000). This decision is not controlling on this court, of course; the *Hawkins* decision is.

 More importantly, this court took care to address the "no harm" argument in its memorandum. *AngioDynamics, Inc. v. Biolitec AG,* 946 F.Supp.2d at 212–13, 2013 WL 1567739, at *4. The court noted that the First Circuit has demanded that courts look only to the text of an order to determine what is forbidden by it. *Goya Foods, Inc. v. Wallack Mgmt. Co.,* 290 F.3d 63, 76 (1st Cir.2002). The power of contempt makes this careful attention to the actual wording of an order, rather than exploration of its supposed inchoate "purpose," crucial. Courts must narrowly cabin the circumstances in which contempt may be found by anchoring the finding on the words of the order. *United States v. Saccoccia,* 433 F.3d 19, 28 (1st Cir.2005). Here the text could not have been clearer about what behavior was forbidden.

If Defendants had any doubt as to what actions would violate the order, "[they] could have asked the district court for clarification ..., but they eschewed that course. They chose instead to rely on their own judgment.... In so doing, [they] acted at their peril." *Goya Foods,* 290 F.3d at 75–76. At argument, Defendants conceded that they deliberately did

---

**4.** Defendants' argument here is even weaker than the child's, since Defendants, as will be

seen, have the power to effectively undo the merger—to call the snowball back.

not confer with Plaintiff's counsel or notify the court before taking the supposedly harmless action of flouting the order. (Dkt. No. 233, Tr. Apr. 3 Hr'g 23–4.) Their reason for doing this was manifest: they knew they were violating the order and did not wish to give Plaintiff or the court notice of their intent. Their contempt was knowing, intentional, and brazen.

But there is more. Although it has no bearing on the principle embedded in this dispute, the court in fact found that Plaintiff *would* be harmed by any merger and that Plaintiff *has been* harmed now that the merger has taken place. In granting the original motion for preliminary injunction, and in reconsidering the injunction, the court was required to consider, and did consider, the issue of likely harm to Plaintiff.

During argument in connection with reconsideration of the preliminary injunction before this court, Defendants made very nearly the same argument they are offering here: that the merger of BAG with its Austrian sister corporation would put Plaintiff in no worse a position than it was in before the merger. Plaintiff argued vigorously to the contrary, pointing out that while enforcement of an American judgment in a German court might present Plaintiff with some difficulties, enforcement in Germany was not impossible, whereas all parties conceded that enforcement of an American judgment in Austria would be flatly impossible. The court agreed with Plaintiff's argument.

Some series of symbols in higher mathematics may depict the difference between a proposition that might be true and one that is utterly impossible, but common sense can draw the distinction perfectly well without equations. Plaintiff demonstrated likelihood of harm. This court found this originally and found it on recon-

sideration, and the Court of Appeals affirmed this finding.

Now that the merger has taken place, the stronger evidence of record confirms that the harm, in fact, has occurred more or less as predicted. In other words, while it does not matter that Plaintiff has been harmed—in light of the principle that valid court orders cannot be flouted without consequences—Plaintiff has, in fact, been seriously harmed. Defendants' argument that certain assets remain in Germany (exactly what these may be is not specified) and that the headquarters of this now-Austrian corporation (a lightly staffed office) remain in Germany cannot obscure the fact that the merger has put Plaintiff in a substantially more difficult position in terms of enforcing any judgment it might receive in this court.

It is significant that Defendants' arguments describing some supposed independent justification for the merger, apart from hamstringing Plaintiff, have never added up. Stated differently, any rationale for the merger beyond harming Plaintiff's potential enforcement efforts is a fabrication. Indeed, Defendant Neuberger's former associate, Stefan Spaniol, has submitted an affidavit confirming that Neuberger's intent in pushing forward with the merger, conveyed to Spaniol explicitly, was specifically to make enforcement of any judgment against BAG difficult if not impossible. (Dkt. No. 123–1, Second Spaniol Decl. ¶ 3.)

In sum, even if harm to Plaintiff were relevant, which it is not, harm to Plaintiff flowing from the merger, contrary to Defendants' arguments, has been found over and over again.

█ It is well established that "[f]ederal courts are empowered to issue civil contempt sanctions to 'protect[ ] the due and orderly administration of justice . . . and

maintain [ ] the authority and dignity of the court.' " *Goya Foods*, 290 F.3d at 78 (alterations in original) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)). A coercive fine or term of imprisonment is an appropriate civil contempt sanction if it is done to induce "the purging of contemptuous conduct." *In re Kave*, 760 F.2d 343, 351 (1st Cir.1985). Sanctions are coercive if they are conditional and can be lifted if the contemptuous conduct is cured. *Id.* Here the sanctions are conditional and may be reconsidered when and if Defendants ever propose a plan for restoring the status quo prior to the merger.

Under these circumstances, Defendants are entitled to no "relief" from the court's order of contempt. No exceptional circumstances exist under Rule 60 justifying reconsideration. The supposed "transparent invalidity" of the court's order, based on the supposed lack of harm to Plaintiff, is nonsense.[5]

2. *Impossibility of compliance.*

■ Defendants make four arguments why any remedial action it might take to undo the prohibited merger would be impossible: (1) it is "highly unlikely to be successful"; (2) it would take at least ten months to complete; (3) it would possibly expose the board to breach of fiduciary

duty claims under Austrian and German law; and (4) it might be contrary to Austrian law. (Dkt. No. 268, Am. Notice of Impossibility 2.)

None of these arguments holds water. Defendants contend only that remedial steps would be cumbersome, and both their German and Austrian law experts acknowledge that while the process would be lengthy, it would be possible.[6] (Dkt. No. 264–1, Zollner Decl. ¶ 5; Dkt. No. 264–4, Gebhardt Decl. ¶ 25.) Defendants' German law expert opines that it is "highly uncertain whether Biolitec AG could successfully relocate its corporate domicile to Germany." (Dkt. No. 264–4, Gebhardt Decl. ¶ 26.) This is artful equivocation, not a statement of impossibility. Defendants' ambiguous representations are especially suspect in light of the evidence, noted both by this court and by the First Circuit, of Defendants' past bad faith. *AngioDynamics, Inc.*, 711 F.3d at 250 n. 1.

The claim of possible breach of fiduciary duty rings particularly hollow. First, Defendant Neuberger owes this duty mostly to himself, since he owns or controls a great majority of the stock in both defendant corporations. Second, it is hard to imagine any breach of fiduciary duty on the part of an officer of a corporation greater than behaving in such a way that a warrant is issued for his arrest for malfea-

---

5. Indeed, the decision Defendants rely on simply held: "A party subject to an order that constitutes a transparently invalid *prior restraint* on *pure speech* may challenge the order by violating it." *In re Providence Journal Co.*, 820 F.2d at 1344 (emphasis added). The First Circuit noted that this is an exception to the "sine qua non of orderly government, that, until modified or vacated, a court order must be obeyed." *Id.*

Here, however, the First Circuit has held that the preliminary injunction at issue was valid. Moreover, both the initial preliminary injunction and subsequent sanctions order impose no prior restraint on speech.

6. As noted previously in the contempt order, "It may indeed be impossible, as Defendants' counsel suggested, technically to 'rescind' the merger at this time. The court makes no finding on this point, beyond the observation that Defendants' general credibility about what it can or cannot do is subject to doubt. In any event, Defendants concede that restoring the status quo ante would in fact not be impossible, but merely lengthy, burdensome, and onerous. (Dkt. No. 233, April 3 Hearing Tr. 36.)" *AngioDynamics*, 946 F.Supp.2d at 214, 2013 WL 1567739, at *5.

sance and the corporation is exposed to monetary sanctions in the millions of dollars. Re-working the merger is very small potatoes in comparison.

It is significant that at one point Defendants did in fact propose to delay the start of sanctions so Defendants could "propos[e] a plan to [Plaintiff] to start implementing" whatever efforts were necessary to put "the genie" "back into the bottle." (Dkt. No. 248, Tr. Apr. 11 Hr'g, 47:2–8 & 44:20–23; *see also AngioDynamics,* 946 F.Supp.2d at 215, 2013 WL 1567739, at *6 (extending the date from May 1 to May 10 for sanctions to begin, to permit discussions).) No claim of impossibility was offered at that time.

Indeed, Defendants' counsel offered to come back to the court with a specific plan of action to purge the contempt. The court noted that it would not delay the sanctions until a plan was submitted and vetted, but that it would allow Defendants to submit a plan that could be vetted by Plaintiff to ensure that Defendants' actions would result in "effective and substantive compliance." (Dkt. No. 248, Tr. Apr. 11 Hr'g 40:15–22; 45:4–11.) No such plan has ever been submitted.

Even now, if the court were convinced that a plan submitted by Defendants were effectively aimed at remedying the contempt, a motion to reduce or vacate the sanctions would be considered. (*Id.* at 46:7–19.) The goal of this court is not to punish Defendants gratuitously; the goal is to obtain compliance with the court's order.

In sum, the argument that any effort to remedy Defendants' violation of the preliminary injunction and purge themselves from contempt would be impossible is not supported by the record and lacks credibility. The "impossibility" argument does not justify "relief" from the contempt order.

### 3. *German law.*

■ The claim that the court must delve into the intricacies of German law to support its finding of contempt requires little discussion. Only two things need be said.

First, despite whatever disagreements may exist among the parties' experts, one thing is clear: the merger has placed Plaintiff in a more difficult position than it would have occupied had the merger never occurred. Moreover, ample evidence exists to support the conclusion that this was Defendants' clear motive for proceeding with the merger. Other purported justifications are simply not credible.

Second, no investigation of German law can alter the fact that Defendants knowingly and intentionally flouted the court's order. Once the court found a likelihood of harm and issued an injunction, Defendants were not entitled to ignore the order and then demand a renewed hearing on the issue of harm to avoid contempt.

In sum, the "German law" argument provides no basis for relief from the contempt order under Rule 60.

Accordingly, because none of Defendants' arguments for "relief" from the finding of contempt is remotely persuasive, the motion (Dkt. No. 269) will be denied.

### B. *Vacating the Preliminary Injunction Based on the First Circuit's Reasoning.*

■ After taking the very action forbidden by the preliminary injunction, Defendants have filed a motion to vacate the preliminary injunction based on the April 1, 2013, decision of the First Circuit affirming the injunction. (Dkt. No. 277.) In its decision, the First Circuit held:

The district court did not commit clear error in concluding that—given the conflicting testimony of experts as to German law and the lack of evidence as to the location of BI's stock certificates—there was a possibility that ADI could enforce its judgment against BI in Germany, but no possibility of enforcement in Austria should the merger be completed and BAG's assets transferred to Austria. The court thus did not err in finding that ADI had demonstrated BAG's merger would cause it irreparable harm. Similarly, the court did not err in concluding that ADI had demonstrated that in the absence of a freeze on defendants' assets, ADI would suffer irreparable harm, since the court could not otherwise assure that assets would remain available to satisfy ADI's judgment against BI.

*AngioDynamics,* 711 F.3d at 252.

In this motion, Defendants argue that the court must vacate the preliminary injunction and conduct proceedings to determine, at this stage, exactly what the actual challenges might be that Plaintiff would confront if it obtained a judgment against Defendants (specifically, against BAG) and attempted to enforce that judgment in Germany against this now-Austrian corporation. The court bears this obligation, Defendants say, because Defendants have provided new evidence on certain issues—for example, the location of some stock certificates—referred to in the First Circuit's decision on appeal.

The short answer to this argument is that, even assuming that the evidence might be pertinent, no sufficient new evidence has been proffered by Defendants to merit any reconsideration. For example, the record still contains no authoritative evidence on where the stock certificates were located at the commencement of this action.

Defendants point to the affidavit of Defendant Neuberger as supposed proof that the stock certificates are located in Germany. However, a reading of the affidavit reveals that all Defendant Neuberger actually states in his deposition is that he "personally recall[s] seeing those original share certificates in Germany ... in November 2000." (Dkt. No. 277–2, Neuberger Aff. ¶ 2.) Neuberger opines that there would be no reason to send the stock certificates to the United States. He also testifies that he saw the certificates in Germany years after the public offering, but he does "not recall the precise year or the circumstances." (*Id.*) This declaration, which was available to the court when it made the contempt finding, does not remotely show that the "judgment is void" or demonstrate any other reason that justifies the "extraordinary relief" that is only granted sparingly under Fed.R.Civ.P. 60(b)(4) or (6). *Karak,* 288 F.3d at 19.

Additionally, while Defendants have provided voluminous submissions on the content of German law, nothing definitively refutes Plaintiff's argument that enforcement of an American judgment against a German corporation in Germany is, in the proper circumstances, possible. Even Defendants' attorney conceded that there was "no question" that the judgment Plaintiff obtained in New York in a separate case would *not* be enforced in Austria, while there was a "very remote" chance of enforcement in Germany. (Dkt. No. 142, Tr. Sept. 17 Hr'g 75:9–12; 76:6–7.) Moreover, the stronger evidence confirms that attempting to enforce an American judgment in Germany against an Austrian corporation with no significant identified assets in Germany would present Plaintiff with as difficult a challenge as the impossible task it would face in enforcing the judgment in Austria.

In sum, Defendants have offered no new evidence, and no compelling argument, justifying allowance of their motion to vacate the preliminary injunction. For this reason, Defendants' Motion to Vacate Preliminary Injunction Based on the Reasoning of the First Circuit's April 1, 2013 Decision (Dkt. No. 277) will be denied.

## C. Recusal.

■ Defendants have filed a Motion for Recusal or Disqualification pursuant to 28 U.S.C. § 455(a).

■ As the First Circuit has recently observed, 28 U.S.C. § 455(a) requires recusal based on "the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality in the course of the trial and its preliminaries." *In re Bulger*, 710 F.3d 42, 46 (1st Cir.2013). Application of this standard requires care to "prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *Id.* at 47 (quoting *In re Allied–Signal Inc.*, 891 F.2d 967, 970 (1st Cir.1989)).

In this legal landscape, a few basic facts are relevant. Apart from this litigation, the undersigned has had no contact with the individual Defendant Neuberger at any time, or any connection of any kind with any of the corporate Defendants, Plaintiff, the witnesses, or anyone connected to this case. Defendants do not suggest otherwise.

■ Defendants' only asserted basis for recusal is rooted in their unhappiness in the way the court has conducted portions of the hearings and particularly the court's comments following Defendants' defiance of the injunction. It is well established that "the general rule is that re-marks a judge makes in the course of ongoing judicial proceedings, remarks *that* are in the nature of reactions to what the judge has observed, do not warrant disqualification." Charles Gardner Geyh, Fed. Judicial Ctr., *Judicial Disqualification: An Analysis of Federal Law* 31 (2d ed. 2010). "[Parties are] entitled to an impartial judge; [they are] not entitled to an ingenuous one." *Logue v. Dore*, 103 F.3d 1040, 1046 (1st Cir.1997).

■ It is also black-letter law that opinions formed by a judge about the parties before him or her, formed during the course of the litigation can only rarely provide the basis of a motion for recusal. *Liteky v. United States*, 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings ... do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555, 114 S.Ct. 1147.

■ This limitation on recusal is obvious. A litigant cannot behave badly, then point to the judge's disapproval of its misconduct, even intense and strongly worded disapproval, as a basis to remove him or her.

■ It is true that the type of deep-seated antagonism that requires recusal can, in extreme circumstances, be evidenced by a judge's oral comments. However, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Remarks that do not establish partiality include "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and

women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.*

When a court is faced with allegations of partiality toward a party, the First Circuit has counseled that the record must be read as a whole instead of focusing on isolated incidents. *United States v. Espinal–Almeida,* 699 F.3d 588, 607 (1st Cir. 2012). It is certainly true that the brazenness of Defendants' contumacy struck the court as extraordinary, and some of their counsel's arguments to justify this conduct as childish and patently deficient. The court used strong language to express its opinions, but that was all.

Two things about the relations between court and counsel are important to emphasize. First, although the court was impatient with some of counsel's arguments and disgusted by Defendants' misconduct, there was no personal abuse of counsel. No voice was raised; the court used strong words but delivered them dispassionately.

Second, Defendants' attorney acknowledged that the court's frustration was understandable. (Dkt. No. 233, Tr. Apr. 4 Hearing 35:19–22 ("I understand that you are upset about it. Frankly if I was in your shoes, I would be upset about it too.").) He also conceded that the First Circuit likely held a similar opinion of his client's conduct. (*Id.* 37:13–16 ("I recognize that the First Circuit's decision is a clear indication that it was also very unhappy with the conduct of my client in completing this merger.").)

In the end, the First Circuit has said it best.

[J]udging is all about making judgments, obviously. And human nature being what it is, those tasked with making some of the hardest calls imaginable may, quite understandably, develop strong feelings about the cases they work on. So while they must avoid even the appearance of partiality, even when bias or prejudice does not exist, we do not expect trial judges to act like unemotional cyborgs of sci-fi fame. That is why problems with the views they form in slogging through cases typically do not provide 'a sound basis either for required recusal or for directing that a different judge be assigned on remand.'

*Candelario del Moral v. UBS Financial Services Inc. P.R.,* 699 F.3d 93, 106 (1st Cir.2012) (quoting *Hull v. Mun. San Juan,* 356 F.3d 98, 104 (1st Cir.2004) (internal citations omitted)).

There is simply no basis for recusal here.[7]

## IV. *CONCLUSION*

For the foregoing reasons, Defendants' Amended Motion for Relief from Contempt Order (Dkt. No. 269), Defendants' Motion to Vacate Preliminary Injunction (Dkt. No. 277), and Defendants' Motion for Recusal (Dkt. No. 274) are all hereby DENIED.

It is So Ordered.

---

**7.** In Act III, scene iv, of *Hamlet* the Danish prince recommends to his mother that she "lay not that flattering unction to your soul. That not your trespass but my madness speaks." Defendants might do well to consider this advice.