In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-2828

PETER S. OHR, Regional Director
of the National Labor Relations Board,
for and on behalf of the National
Labor Relations Board,

*Petitioner-Appellee,*

*v.*

LATINO EXPRESS, INC.,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-C-2383 — **John F. Grady**, *Judge.*

ARGUED SEPTEMBER 19, 2014 — DECIDED JANUARY 12, 2015

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Latino Express, Inc. appeals a district court order finding the company in civil contempt of an earlier order granting injunctive relief to the plaintiff, Peter Ohr, the Regional Director ("Director") of the National Labor Relations Board ("Board") on behalf of the Board. That

underlying order sought to address Latino Express's viola-
tions of the National Labor Relations Act ("Act") as its em-
ployees attempted to certify a union.

## I.

Because this appeal stems from a finding of civil con-
tempt of an injunctive order of the district court, the only
relevant facts are those regarding the enjoined party's ac-
tions or lack thereof following the issuance of that first or-
der. Nevertheless, the brief rendition of the facts leading to
the underlying order will help round out an understanding
of the case.

Carol Garcia and Peter Salgado, bus drivers for the
transportation company, Latino Express, thought they might
improve their working conditions through the help of the
Teamsters Local Union No. 777 ("Union"). Toward that end,
the two employees, along with some co-workers, began so-
liciting signatures from other drivers to certify the Union as
the official representative of the employees. Garcia and Sal-
gado met with resistance from the company owners and
managers who began efforts to undermine the Union activi-
ty and the two employees were eventually terminated.

Garcia and Salgado filed claims with the Board alleging
that Latino Express had violated §§ 8(a)(1) and (3) of the Na-
tional Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3) by
interfering with their union organizing activities. A fuller
description of that interference can be found in the district
court's opinion in *Barker ex rel. Nat'l Labor Relations Bd. v. La-*

*tino Express, Inc.*, No. 11-C-2383, 2012 WL 1339624, at *1-3 (N.D. Ill. April 18, 2012), (R. 38, pp.1-11).[1]

The Regional Director of the NLRB petitioned the district court for interim injunctive relief under section 10(j) of the Act, which allows the Director to request from a local district court temporary relief from an unfair labor practice pending the Board's remedial action. *Harrell ex rel. NLRB v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir.), *cert. denied* 134 S. Ct. 437 (2013); 29 U.S.C. 160(j). More precisely, section 10(j) directs district courts to grant relief that is "just and proper," meaning that (1) the Board has no adequate remedy at law; (2) the union will be irreparably

---

[1] Latino Express, of course, denied each of the allegations, but the Board has now found that the respondent did indeed violate Sections 8(a)(1), 8(a)(3) and (1). *See Latino Express, Inc. and Carol Garcia and Pedro Salgado and Int'l Bhd. of Teamsters, Local 777*, 361 NLRB No. 137, 2014 WL 7149505, *1 (December 15, 2014). The Board's ruling, however, is irrelevant to our current analysis, as this appeal is from a finding of contempt order issued by the District Court of the Northern District of Illinois, pursuant to its jurisdiction to do so under Section 10(j) of the National Labor Relations Act. Latino Express initially argued that the Supreme Court's recent decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014) required dismissal of this appeal. Latino Express now agrees with the Board that because this is an appeal from an order of the district court, the *Noel Canning* decision is not relevant. *See* Position Statement by Appellee Peter S. Ohr to Court Order of 7/9/14, and Statement of Position by Appellant, Latino Express Incorporated to the Supreme Court's Decision in NLRB v. Noel Canning (at R. 37 and 38 in this court's docket). And in any event, the Board's December 15, 2014 ruling rectified any constitutional infirmities in its July 31, 2012 order as identified in *Noel Canning* (*see* footnote 2, infra). In short, the *Noel Canning* decision does not affect the adjudication of the issues before us.

harmed without interim relief, and that potential harm to the union outweighs potential harm to the employer; (3) public harm would occur without the relief; and (4) the Board has a reasonable likelihood of prevailing. *Id.* The idea underpinning 10(j) is that a district court can issue a speedy preliminary injunction to protect a union where the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process *Lineback ex. rel. NLRB v. Irving Ready–Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011).

The Director's petition for injunctive relief in this case alleged that the Board would likely rule that Latino violated the Act by (1) creating the impression that the employee's union and/or other concerted activities were under surveillance; (2) promising and granting employees improved benefits in response to a union organizing campaign; (3) instructing employees not to speak with each other about the company's accident reimbursement policy; (4) announcing to its employees that union representation was never going to happen at the facility; (5) interrogating employees about their union activity and threatening to discharge them; and (6) soliciting grievances from employees in response to a union organizing campaign. The Director also requested interim reinstatement for employees Garcia and Salgado arguing that all of the interim relief would prevent irreparable harm to the employees' bargaining rights and preserve the remedial power of the Board. The district court agreed and granted preliminary injunctive relief on April 18, 2012, enjoining Latino Express from the following prohibited activities:

> (a) discharging or otherwise discriminating against employees for supporting the Union;
> (b) coercively questioning employees about

their union support or activities; (c) prohibiting employees from discussing with their co-workers issues related to their terms and conditions of employment; (d) creating the impression that employees' union activities are under surveillance; (e) promising improved benefits to employees or soliciting grievances from them in order to discourage union support; (f) threatening to discharge employees or to close the company's facility in response to their union activities; (g) warning employees that it would be futile to engage in union activities; and (h) in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

*Latino Express, Inc.*, 2012 WL 1339624, at *12 (April 18, 2012) (R. 38, pp.35-36). The Director also successfully requested that the district court require Latino Express to take the following affirmative actions:

(a) within five days of our order, reinstate Carol Garcia and Pedro Salgado to their former positions; (b) temporarily remove from its files any references to the unlawful discharges of Carol Garcia and Pedro Garcia and, within three days thereafter, notify each of them in writing that this has been done and that the discharges will not be used against them in any way prior to a final Board order; (c) within five days of our order, post a copy of the order, together with a Spanish language translation

> prepared at Latino Express's expense, to be
> approved by the Director, at Latino Express's
> facility where notices to employees are cus-
> tomarily posted, maintain the posting during
> the Board's administrative proceedings, and
> take reasonable steps to ensure that the order is
> not altered, defaced, or covered by any other
> material, and grant agents of the Board reason-
> able access to the facility to monitor compli-
> ance with the posting requirement; (d) within
> 21 days after we issue our order, file a sworn
> affidavit with this court from a responsible La-
> tino Express official setting forth, with specific-
> ity, the manner which Latino Express has com-
> plied with the terms of our order, including
> how the documents have been posted as re-
> quired by our order, and provide a copy of the
> sworn affidavit to the Director.

*Id.* (R 38, pp. 36-37).

On April 23, 2012, Latino Express moved for an extension of time in which to file a response to the Director's proposed order. At a hearing on April 25, 2012, Latino Express explained that its employees had withdrawn their recognition of Teamsters Local 777 as their collective bargaining representative and that a decertification petition was forthcoming. The company argued that decertification of the Union would nullify the preliminary injunction issued by the district court. The district court correctly concluded, as we will discuss further below, that the Union's status at the time of the contempt hearing was irrelevant. *Barker ex. rel. NLRB v. Lati-*

*no Express, Inc.*, No. 11-C-2383 (N.D.Ill. April 26, 2012) (R. 41).

On April 26, 2012, Latino Express filed its notice of appeal of the district court's issuance of the injunction, and on May 8, 2012, the company moved the district court to reconsider and stay enforcement of the injunction reiterating its argument that a decertification petition filed by its employees affected the enforcement of the injunction.

On May 9, 2012, the district court denied Latino Express's motion, ruling once again that the prospect of decertification was not a basis to reject or revise the injunction. *Barker ex. rel. NLRB v. Latino Express, Inc.*, No. 11-C-2383 (N.D.Ill. May 9, 2012) (R. 51). And by May 21, 2012, the Board concluded that Latino Express was in contempt for its failure to comply with the April 25 injunction, and the Director moved the district court to enter an order to that effect. The district court conducted an evidentiary hearing on June 12 and 13, 2012, the findings of which we will discuss below as we evaluate the propriety of the district court's ruling. On July 2, 2012 the district court issued its memorandum opinion finding Latino Express in civil contempt for failing to comply with the injunction. *Barker ex. rel. NLRB v. Latino Express, Inc.*, No. 11-C-2383, 2012 WL 2522287 (N.D.Ill. July 2, 2012) (R. 61). Latino Express appealed to this court and we affirm.

## II.

The district court below based the bulk of its contempt finding on the factual findings it made that Latino Express did not perform any of the actions required by the April 25, 2012 order on or before the April 30, 2012 deadline, and had no legal defense justifying its failure to do so. Our review is

deferential. We review a finding of civil contempt for abuse
of discretion, evaluating the district court's legal conclusions
de novo and its findings of fact for clear error. *Blockowicz v.
Williams*, 630 F.3d 563, 567 (7th Cir. 2010). A district court's
order will be reversed only if it "depends on faulty legal
premises, clearly erroneous factual findings, or improper
application of the criteria governing preliminary injunctive
relief." *Am. Red Cross*, 714 F.3d at 556 (*citing NLRB v. Electro-
Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996)). We find no er-
ror here.

To prevail in its request for a contempt finding, the Di-
rector had to establish by clear and convincing evidence that
(1) the district court's order set forth an unambiguous com-
mand; (2) Latino Express violated that command; (3) the vio-
lation was significant, meaning that Latino Express did not
substantially comply with the order; and (4) Latino Express
failed to make a reasonable and diligent effort to comply.
*U.S.S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). The dis-
trict court found that the Director established by clear and
convincing evidence each of these elements, and we agree.

**A.**

As the district court noted, the April 30, 2012 deadline
came and went without action by Latino Express. On May 4,
the Director notified Latino Express that it had received evi-
dence that the company had not complied with the April 25
order. On May 8, 2012, one week after the April 30 deadline
had passed, and after the Director's notification of non-
compliance, Latino Express filed a motion to reconsider and
stay enforcement of the April 25 order stating, without ex-
planation, that a union decertification petition was pending

(an issue that had already been argued and rejected by the district court in a hearing on April 25, 2012).

On May 9, 2012, the district court denied Latino Express's motion to reconsider, noting that it had already rejected the argument that the decertification petition affected the previous order and correctly concluding that the NLRA's protections are not contingent on the existence of a presently-certified union. *Latino Express, Inc.*, No. 11-C-2383 (May 9, 2012) (R. 51). The NLRA protects employees while they are in the process of attempting to organize. *See* 29 U.S.C.A. §§ 157, 158. It also protects employees from employers who may be attempting to unlawfully encourage employees to petition to decertify a union. *See, e.g. In re Armored Transp., Inc.*, 339 NLRB 374, 377 (2003); *Beverly Cal. Corp. v. NLRB*, 227 F.3d 817,841-842 (7th Cir. 2000). Because unions, especially new ones, can be vulnerable to employers' unlawful efforts to undermine them, the Board's duty to monitor compliance with the Act can be particularly important during a movement to decertify a fledgling union. *See Latino Express*, 2012 WL 2522287, at *3 (July 2, 2012), (R. 61, pp.2-3); *Lineback, LLC*, 546 F.3d at 500-01. Until a union is actually decertified, the "company's obligations to it are the same as they had been before the election and if it spurns those obligations it is guilty of an unfair labor practice." *Heartland Human Servs. v. NLRB*, 746 F.3d 802, 804 (7th Cir. 2014). Moreover, the injunction did not contain any provisions that affected the Union in any way.

In juxtaposing the requirements of its injunctive order against Latino Express's actions, the district court first found that Latino Express did not offer to reinstate Garcia and Salgado by April 30, 2012, as required. Nor did it do so on May

4, when the Board notified Latino Express's counsel that it had failed to comply with the order. It was not until one day after the district court denied its motion to reconsider that Latino Express made any effort to comply at all, and to say its efforts fell short is a charitable statement indeed.

On May 10, one day after the district court denied the motion to reconsider, part owner and vice president of Latino Express, Henry Gardunio, mailed letters offering conditional reinstatement to Garcia and Salgado. Those letters stated as follows:

> This is written to inform you that you are being offered immediate, interim restatement [sic] to your previous position. Please report to work at 6:30 a.m. on Monday, May 14, 2012 <u>ready and able to work as a school bus driver for Latino Express</u>. Report directly to Mr. Henry Gardunio.
>
> If you do not report to work <u>ready and able to work as a school bus driver for Latino Express</u> on the date above, at the time above, Latino Express will presume that you are rejecting its offer for immediate, interim restatement [sic], and the offer will automatically expire.

*Latino Express, Inc.*, 2012 WL 2522287 at *2-3 (July 2, 2012) (R. 61, p.5) (emphasis added by district court) (*citing* R. 54-1, p.21). The district court concluded, and we concur, that the phrase "ready and able to work as a school bus driver," was a thinly-veiled reference to the fact that Garcia and Salgado would have to meet the license and permit requirements ap-

plicable to school bus drivers in Illinois. Both Garcia's and Salgado's permits had expired after they had been illegally terminated and without the necessary assistance from an employer, they were unable to renew the permits.

The conditional reinstatement letter, which arrived on Friday, May 12, required Garcia and Salgado to appear for work at 6:30 a.m. on Monday May 14—the next business day after receipt of the letter. As instructed, Salgado arrived at 6:00 a.m. on Monday, May 14. Gardunio approached Salagado and asked him for his permit to drive a school bus. When Salgado stated that he did not have one, Gardunio accused him of violating the terms of the reinstatement letter. The manager, Sara Martinez, then approached with a spreadsheet listing the names of drivers and the expiration dates of their school bus permits, and referred the two men to an entry showing that Salgado's had expired. Salgado immediately complied with Gardunio's order to leave the premises.

Garcia arrived to a similar scene at 6:20 a.m. the same morning. Gardunio requested that she present her permit, and when she explained that it had expired, he accused her of not complying with the terms of the agreement, and told her that there was nothing he could do. Garcia left the premises without a job.

The district court found that Garcia and Salgado could not have renewed or reapplied for a new permit without the assistance of Latino Express, and that Latino Express was not only aware of this fact, but used it as a means to deny reinstatement to the employees. As the district court found, in addition to the individual requirements for renewing a permit, each employee must have a current or prospective

employer certify that she has satisfied all statutorily-required "pre-employment conditions." *Latino Express, Inc.,* 2012 WL 2522287 at *3 (July 2, 2012) (R. 61, pp.6-7) (*citing* Office of the Secretary of State Driver Services Department, School Bus Application/Certification, R. 54-1, pp.46-47). Having been unlawfully terminated by Latino Express, both Garcia and Salgado were unemployed and could not provide the necessary certification to renew their permits. They also could not provide the similar certification required to apply for a new license.

In finding that Garcia and Salgado needed Latino Express's assistance to renew their permits, the district court also relied on Illinois statutes establishing the permit requirements and the application form itself noting that the statute and forms served as evidence that an employee cannot obtain a new bus permit or renew an existing one without the assistance of the employer. The relevant statute requires employers to distribute to their potential employees the permit application and medical forms, to conduct a pre-employment interview, to submit the applicant's fingerprint cards to the Department of State Police, and to certify in writing that all pre-employment conditions have been successfully completed. 625 ILCS § 5/6-106.1(a) and (d). Similar current or prospective employer assistance is required to renew an existing permit. 625 ILCS § 106.1(b). The renewal notices and forms clearly indicate that the employer must complete portions of the forms. *See* (R. 54-1, pp.44-47).

Latino Express's brief is filled with descriptions of all of the portions of the bus permit requirements which fall upon the individual applicant, but it simply ignores the certification requirements that must be fulfilled by the employer. It

also ignores the fact that Latino Express has a practice of providing substantial assistance to employees in obtaining and renewing school bus permits. When Latino Express hired Garcia in 2008, for example, she did not have a current school bus permit, but the company walked her through the processes to obtain one. Manager Sara Martinez gave her a letter to take to the Secretary of State explaining that she was employed by Latino Express and needed to take the required written examination. Martinez also gave Garcia a question-naire for a doctor to complete, and directed her to a medical facility to complete the required physical examination. Mar-tinez made all of the arrangements for Garcia to attend the required initial classroom training course, including handing her a form for the classroom instructor to sign and return to Martinez. A Latino Express employee administered the road test required to get a new permit—portions of which took place on Latino Express's premises. A Latino Express em-ployee also accompanied Garcia to get fingerprinted for her background check. Latino Express covered all of the upfront costs incurred in securing the permit and Garcia reimbursed the company through a payroll deduction. When Garcia re-turned to Latino Express after the court ordered reinstate-ment, Latino Express did not offer to assist Garcia in any manner.

Salgado had a similar experience. When he was hired, Latino Express gave him a letter to take to the Secretary of State, made all of the arrangements for him to attend the ini-tial training course, sent him to a facility for fingerprinting and a background check, and sent him to a doctor for his re-quired physical examination. As with Garcia, Latino Express administered his road test portions of which took place on the company premises. Salgado testified that he only reim-

bursed the company for half of the associated costs through payroll deduction.

Furthermore, during Garcia's employ, when her permit expired, Martinez made all of the arrangements for Garcia to attend the required refresher classroom training course, gave her the necessary paperwork for her updated physical examination, and gave her a $4 money order to send along with her forms to the Secretary of State. Latino Express similarly assisted other employees, but made no offers to help in any way when Garcia and Salgado arrived early on a Monday morning after having been told to return to work the Friday before.

Gardunio denied knowing that Salgado and Garcia did not have their permits when he sent the offer letters, but the district court found his explanation to be implausible, and, of course, absent clear error, we will defer to this credibility determination. *U.S. v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013). The district court found ample evidence that the company kept track of permit expiration dates—including the revealing fact that the manager held such a spread sheet in her hand on the day Salgado arrived for work. It also concluded that even if Gardunio did not personally keep track of individual drivers' permit statuses in the ordinary course of business, the circumstances of Garcia and Salgado's reinstatement by court order were extraordinary, and that fact, along with the multiple references requiring the employees to be "ready and able to work" for reinstatement, indicated that Gardunio knew that the permits had expired when he sent the letters. Moreover, even if he did not know it then, his failure to offer assistance to Garcia and Delgado upon their return, as was the usual practice, also indicated that La-

tino Express was attempting to skirt the command of the court's order.

The district court's conclusion that Latino Express's belated reinstatement offers were illusory is more than supported by the evidence we described above. The short notice contained in the letter, the "ready and able" language, and the departure from the custom to provide significant assistance to new and renewing drivers all provided more than ample evidence that Latino Express was not making a reasonable and diligent effort to comply with the order. In fact, its efforts to avoid compliance were elaborately crafty.

The district court also found that Latino Express did not comply with the injunctive order's requirements to post, by April 30, 2012, the contempt order (and a Spanish translation) in a place where notices to employees are normally posted. Gardunio admitted that the district court order was not posted at Latino Express until May 10, 2012, more than one week after the April 30 deadline. He further testified that a Spanish translation was posted the same day and submitted to the Director of the NLRB for approval as required by the court order. The district court determined that the translation contained several errors and that portions of the order were not translated at all. Gardunio himself admitted that the translation was lacking. The Director submitted a corrected copy to Latino Express on May 11, 2012, and Gardunio testified that it was posted on the company's bulletin board that same day. The district court found that Gardunio's testimony was evasive and contradictory and further noted that one employee's testimony and photographic evidence persuasively indicated that the approved translation was not posted until May 29, 2012. The district court

dismissed Gardunio's testimony about the May 11 posting as false.

Although the district court concluded that the delay in posting the properly translated Spanish version from May 11 to May 28 likely did not significantly disadvantage the Union, it nevertheless found that it further underscored Latino Express's disregard for the court's order. *Latino Express*, 2012 WL 2522287, at *7 (July 2, 2012); (R. 61, p.17).

In sum, we concur with the district court's finding that Latino Express did not substantially comply, and did not take steps to reasonably and diligently comply with the district court's unambiguous command to reinstate Garcia and Salgado and to post a copy of the order and its translation.

**B.**

Latino Express argues that its May 8, 2012 filing of a motion to reconsider fell under Federal Rule of Civil Procedure 59 and therefore somehow excused its failure to comply with the order by April 30, 2012. It is incorrect for several reasons. First, nothing in Rule 59 grants a moving party an automatic stay during consideration of the motion. Fed. R. Civ. P. 59. Federal Rule of Civil Procedure 62(b) allows a district court the option of granting a stay while it considers a Rule 59 motion, but no such stay was ever granted. To the contrary, the district court denied the motion for a stay the day after it was filed, noting that Latino Express's motion was based on the identical argument that the judge had previously and squarely rejected—that a pending move to decertify the union somehow affected the injunctive order. *Latino Express, Inc.*, No. 11-C-2383 (May 9, 2012) (R. 51). Moreover a Rule 59 motion is not a forum to re-litigate losing arguments; it may

be granted only if the movant can "demonstrate a manifest error of law or fact or present newly discovered evidence." *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 653 (7th Cir. 2014). As the district court described it, "[t]he respondent's defense boils down to this: they believe that they were entitled to ignore our Order because they disagreed with it." *Latino Express, Inc.*, 2012 WL 2522287 at *5 (July 2, 2012); (R. 61, p.11-12). And in so finding, the district court concluded that the Director had proven by clear and convincing evidence that the respondents had failed to take reasonable and diligent steps to comply with the order before April 30, 2012. We agree.

## C.

Our deferential review of the district court's imposition of relief likewise reveals no deficiencies. Latino Express argues first that it was in compliance with the court's order and should not have to pay fees and costs. We have already explained why this is not so. In the alternative, Latino Express argues that by the time of the hearing it was in compliance with all aspects of the contempt order other than the reinstatement of Garcia and Salgado and therefore should not be required to pay all of the Board's costs and expenditures, but rather, only one fourth of them—presumably the fraction it believes represents the reinstatement portion of the litigation.

The district court ordered the payment of the Board's costs and expenses, including reasonable attorney's fees, reasoning that "[t]axpayers should not bear the cost of the respondent's willful disregard of our Order." *Latino Express, Inc.*, 2012 WL 2522287 at *8 (July 2, 2012); (R. 61, p.20). The district court was well within its discretion to do so. Latino

Express and Gardunio intractably recycled the same baseless
argument that a decertification petition affected the proceed-
ings before the district court in the preliminary injunction
hearing, in a motion to reconsider, in the contempt proceed-
ings, and again in this court on appeal. The Director correct-
ly points out that given the respondent's contumacy, it was
necessary to continue to monitor compliance and seek relief
before the court even after the respondent's claimed they
had complied with certain aspects of the order. Although we
agree that the Director is entitled to costs and attorneys' fees,
we decline to make any further rulings, as to do so would be
premature. The district court has yet to assess the amount of
those fees and costs.

### D.

Finally we address Latino Express's argument that the
contempt order is moot having been based on a preliminary
injunction that has expired by its own terms. As we de-
scribed above, Section 10(j) of the Act allows a district court
to grant preliminary injunctive relief effective from the date
issued by the district court until the Board adjudicates the
underlying unfair labor practice case. *See Am. Red Cross*, 714
F.3d at 556. Latino Express argued that when the Board en-
tered its decision and order on July 31, 2012, the preliminary
injunction order issued by the district court became moot, as
by its own terms, the district court's preliminary injunction
order only remained in effect until the NLRB issued its deci-
sion. [2]

---

[2] The original July 13, 2012 order of the Board suffered from constitu-
tional infirmities identified in *Noel Canning*, 134 S. Ct. at 2550—that is,
the order was issued by a panel of the Board that lacked a quorum be-

Latino Express's argument is simply incorrect. A con-
tempt order does not automatically become moot when the
proceeding out of which it arises terminates, rather it de-
pends on whether the purpose of that contempt order is co-
ercive or compensatory. A civil contempt order can serve to
coerce a party to obey a court order, or it can be intended to
compensate a party who has suffered unnecessary injuries or
costs because of contemptuous conduct. *U.S. v. Slaughter*, 900
F.2d 1119, 1125-1126 (7th Cir. 1990); *Petroleos Mexicanos v.
Crawford Enter., Inc.*, 826 F.2d 392, 400 (5th Cir. 1987). If a civ-
il contempt order is coercive in nature, the general rule is
that it is mooted when the proceeding out of which it arises
terminates. *Id.* On the other hand, if the need for the con-
tempt order survives the termination of the underlying pro-
ceeding, such as when a party must be compensated for
costs and injuries, then the contempt order does not become
moot. *Id.* This non-controversial understanding of civil con-
tempt abatement (or lack thereof) has been described by
court after court. See, e.g., *In re Bradley*, 588 F.3d 254, 264 n.8
(5th Cir. 2009) ("[R]emedial civil contempt sanctions can be

cause some Board members who received recess appointments were not
validly appointed because, at the time of the appointments, the Senate
was not in a recess of sufficient length. 134 S. Ct. at 2557. Those infirmi-
ties have now been rectified *by Latino Express, Inc. and Carol Garcia and
Pedro Salgado and Int'l Brotherhood of Teamsters, Local 777*, 361 NLRB No.
137, 2014 WL 7149505, at *1 (December 15, 2014) ("In view of the decision
of the Supreme Court in *NLRB v. Noel Canning, supra*, we have consid-
ered de novo the judge's decision and the record in light of the excep-
tions and briefs. …Accordingly, we affirm the judge's rulings, findings,
and conclusions and adopt [the] judge's recommended Order to the ex-
tent and for the reasons stated in the Decision and Order and Notice and
Invitation to File Briefs reported at 358 NLRB No. 94, which is incorpo-
rated herein by reference and as amended below.")

appropriate even after the underlying litigation has termi-
nated, in contrast to coercive civil contempt, which becomes
moot if the underlying proceeding terminates."); *U.S. v. Har-
ris*, 582 F.3d 512, 516 & n.4 (3d Cir. 2009) (noting that where
the underlying contempt proceeding is even partially com-
pensatory in nature the contempt does not end with the ter-
mination of the underlying proceeding because it has a rele-
vance independent of and extrinsic to the underlying pro-
ceeding); *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 596
(6th Cir. 1999) (explaining that the expiration of an underly-
ing judgment does not moot the compensatory award of the
costs and attorney fees in the contempt order where willful
obstruction harmed the opposing party by causing the in-
currence of additional legal expenses); *Reliance Ins. Co. v.
Mast Const. Co.*, 84 F.3d 372, 376 (10th Cir. 1996) ("Generally
speaking, a person who violates an injunction or temporary
restraining order during its pendency is subject to a com-
pensatory civil contempt judgment, even if the injunction or
restraining order later terminates due to the passage of time
or mootness."); *In re General Motors Corp.*, 61 F.3d 256, 259
n.3 (4th Cir. 1995) (stating that where the harm suffered by a
party is un-redressed at the time the underlying case was
settled, the contempt proceeding is not moot); *Petroleos Mexi-
canos*, 826 F.2d at 400 (clarifying that, if the civil contempt
proceeding is coercive, "the general rule is that it is mooted
when the proceeding out of which it arises is terminated";
but if the civil contempt proceeding is compensatory, "the
termination of the underlying action out of which the con-
tempt hearing arose does not moot the contempt proceed-
ing."); *Backo v. Local 281, United Bhd. of Carpenters & Joiners*,
438 F.2d 176, 182 (2d Cir. 1970) ("Where a civil contempt
proceeding is coercive in nature and seeks to enforce an in-

terlocutory order, it abates when the proceedings out of which it arises are terminated. No such rule applies to purely compensatory civil contempt judgments.").

Latino Express fails to distinguish between compensatory and coercive relief. The *Pacific Gamble Robinson* case it cites from the district court of Minnesota in 1950 does not support its position. Even that case recognized that the party alleging contempt of an injunctive order had a right to compensatory relief for damages suffered as a result of the contempt, even after the main action has terminated. *Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Ry. Co.*, 92 F. Supp. 352, 356 (D.C. Minn. 1950).

As the district court reasoned, any other interpretation of this rule would eviscerate the effect of Rule 10(j), as a party could simply continue its violation or delay a final finding of contempt long enough that the district court order expired by its own terms. *See Barker ex rel. NLRB v. Latino Express, Inc.*, No. 11-C-2383, p.4 (N.D. Ill. March 1, 2013) (R. 98, p.4).

In this case, the Director sought, and the court granted, coercive relief in the form of prospective fines for Latino Express's future non-compliance with the contempt order. These may no longer be imposed to coerce Latino Express's compliance with the order upon termination of the injunction. On the other hand, the district court also granted compensatory relief in the form of payment to Garcia and Salgado for backpay incurred by Latino's failure to promptly reinstate the employees as ordered by the district court, as well as compensatory relief to the Director for fees, costs and expenditures incurred by the contemptuous acts. This grant of relief survives the termination of the underlying preliminary injunction.

The conclusions and holdings of the district court are therefore AFFIRMED in all respects.