# United States Court of Appeals
## For the First Circuit

No. 15-1645

ANGIODYNAMICS, INC.,

Plaintiff, Appellee,

v.

BIOLITEC AG; BIOMED TECHNOLOGY HOLDINGS, LTD.;
and WOLFGANG NEUBERGER,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Edward Griffith, with whom The Griffith Firm, Michael K. Callan, and Doherty, Wallace, Pillsbury & Murphy, P.C., were on brief, for appellants.
William E. Reynolds, with whom Nixon Peabody LLP was on brief, for appellee.

May 6, 2016

**STAHL**, **Circuit Judge**.  Defendants, who violated a preliminary injunction, appealed the resulting civil contempt order entered by the district court.  The contempt order included a civil arrest warrant and an escalating fines provision.  Defendants persisted in their defiance as the unpaid coercive fines continued to accumulate.  We affirmed the contempt order and remanded "only to direct the district court to amend the sanction order so that the fines cease to accrue at some total amount."  AngioDynamics, Inc. v. Biolitec AG (Biolitec II), 780 F.3d 420, 428 (1st Cir.), cert. denied, 136 S. Ct. 535 (2015).

The district court dutifully followed our instructions, and Defendants promptly appealed the revised contempt order.  In this appeal, Defendants argue that the underlying preliminary injunction expired by its own terms and so the district court can no longer coerce compliance with it.  Because Defendants failed to raise this argument at any time prior to the present appeal, we DENY the appeal.

## I.  Facts & Background

One does not need to venture far back into our catalogue of decisions to find a recitation of facts for this case.  This is Defendants' fourth appeal.  See AngioDynamics,

Inc. v. Biolitec AG (Biolitec I), 711 F.3d 248 (1st Cir. 2013); Biolitec II, 780 F.3d 420 (1st Cir. 2015); AngioDynamics, Inc. v. Biolitec AG (Biolitec III), 780 F.3d 429 (1st Cir. 2015). For the convenience of the reader, however, we take a moment to trace the travel of the case.

In 2012, AngioDynamics, Inc. ("ADI" or "Plaintiff") obtained a $23 million judgment in New York against Biolitec, Inc. ("BI") based on an indemnification clause in an agreement between the two entities. Biolitec I, 711 F.3d at 250. Plaintiff sought to secure payment on that judgment by bringing suit against BI's President and CEO, Wolfgang Neuberger, and its corporate parents, Biomed Technology Holdings ("Biomed") and Biolitec AG ("BAG") (collectively, "Defendants"), which, according to Plaintiff, had looted BI of over $18 million in assets in order to render it judgment-proof. Biolitec III, 780 F.3d at 432. As it turns out, this would be but the first in a series of attempts to evade payment to ADI and to elude the power of the courts.

During discovery, Defendants refused to produce documents and key witnesses, including Neuberger. Id. at 432-33. More importantly, Plaintiff soon learned that BAG, based in Germany, intended to effectuate a downstream merger with its

- 3 -

Austrian subsidiary. Id. at 433. This, Defendants conceded, would transfer BAG's assets to Austria, precluding ADI from enforcing its judgment. Biolitec I, 711 F.3d at 252.

On September 13, 2012, the district court issued a preliminary injunction barring Defendants from carrying out the merger. On December 14, 2012, the district court denied Defendants' motion for reconsideration. Id. at 250. Defendants appealed the preliminary injunction to this Court, which affirmed on April 1, 2013. Id. at 252. While that appeal was pending, however, Defendants decided to go forward with the merger anyway in direct violation of the injunction. Id. at 250 n.1. Defendants effectuated the merger on March 15, 2013, despite repeated assurances to the district court that they would comply with the order. AngioDynamics, Inc. v. Biolitec AG, 946 F. Supp. 2d 205, 211-12 (D. Mass. 2013).

Plaintiff, understandably, moved for the district court to hold Defendants in contempt. Id. at 211. In response, the district court ordered Neuberger to appear in person at an April 10, 2013 hearing to show cause why he should not be held in civil or criminal contempt. Id. at 212. Neuberger defied that order as well, notifying the district court that he would not attend the show-cause hearing. Id.

- 4 -

On April 11, 2013, the district court issued a coercive civil contempt order authorizing escalating, monthly fines against Defendants and an arrest warrant for Neuberger. Id. at 215-16. The decision ordered Defendants to "return Biolitec AG to the status quo ante," which Defendants conceded was possible, albeit through a process that would be "lengthy, burdensome, and onerous." Id. at 214-15. The district court held that "fines and incarceration for civil contempt will continue until Defendants effectively restore the status quo existing prior to the violation of the court's order." Id. at 216. After a few months, Defendants filed another round of motions to revoke the contempt order and vacate the underlying injunction, which the district court denied. Biolitec II, 780 F.3d at 424. Defendants appealed.

While the contempt order and, once again, the injunction were pending appeal, Defendants persisted in stonewalling the district court. Not only did Defendants unequivocally state that they had no intention of complying with the contempt order, Defendants also disregarded the court's warnings that continued defiance of its orders could result in a default judgment. Biolitec III, 780 F.3d at 433, 436. With few tools left at its disposal, the court eventually entered a

default judgment as a sanction for violating its discovery orders and awarded ADI approximately $75 million in damages. Id. at 436. A default judgment entered on January 14, 2014, and a final judgment entered on March 18, 2014. Id. at 433. Again, defendants appealed.

On March 11, 2015, this Court issued decisions in two companion cases. In Biolitec II, we affirmed the district court's civil contempt sanctions as well as the district court's denial of Defendants' motion to vacate the preliminary injunction. 780 F.3d at 429. We recognized, however, that Defendants' unyielding contumacy, paired with the accumulating fine model imposed by the district court, had resulted in a fine that "far exceed[ed] the amount of the original judgment ADI [was] attempting to collect." Id. at 428. This was, admittedly, Defendants' own doing since the power to purge the contempt resided with--and continues to reside with--Defendants. Id. Regardless, we decided that the district court should amend its sanction order "so that the fines cease to accrue at some total amount," and we remanded "for the sole purpose of directing the district court to take action with respect to the total accruing fine amount." Id. at 428, 429. In Biolitec III, issued that very same day, we also affirmed the district court's

decision to enter a default judgment against Defendants as a sanction for discovery violations and to award damages in the amount of approximately $75 million. 780 F.3d at 436-37.

On April 24, 2015, the district court complied with our instructions and revised the contempt order by adding a cap to Defendants' total contempt liability. The district court observed that we had "affirmed the [contempt] decision . . . in all substantive respects" and "remand[ed] only for a clarification with regard to the total amount of the ultimate coercive fine." The court "cap[ped] the fine Defendants will be liable for at a total amount of $70 million, or approximately three times the amount of Plaintiffs' original New York judgment against Defendant Biolitec, Inc."

True to form, Defendants now appeal the district court's revised contempt order. Defendants point to the preliminary injunction, which states, "This Order shall be in effect until this Court enters a final judgment in this action." Alleging that the preliminary injunction therefore "expired" on March 18, 2014, the date on which the district court entered a final judgment in favor of ADI, Defendants now claim that the district court was without authority to enter a "new" contempt

decision on April 24, 2015 to coerce compliance with an "expired" order.

## II. Analysis

Our decision starts and ends with Defendants' failure to raise the argument in their prior appeals. United States v. Arreguin, 735 F.3d 1168, 1178 (9th Cir. 2013) ("We need not and do not consider a new contention that could have been but was not raised on the prior appeal."); In re Cellular 101, Inc., 539 F.3d 1150, 1155 (9th Cir. 2008) ("By failing to raise the . . . issue in the prior appeal, [the party] waived its right to assert the defense in subsequent proceedings."). Simply put, Defendants' window of opportunity to make this argument closed with our twin decisions in Biolitec II and Biolitec III. As we stated in Biolitec III, "[w]e will not revisit legal rulings 'explicitly or implicitly decided by an earlier appellate decision in the same case.'" 780 F.3d at 434 (emphasis added) (quoting Remexcel Managerial Consultants, Inc. v. Arlequin, 583 F.3d 45, 53 (1st Cir. 2009)). "[T]he law of the case doctrine forecloses reconsideration of issues that were decided--or that could have been decided--during prior proceedings." United States v. Williams, 475 F.3d 468, 471 (2d Cir. 2007) (emphasis added).

It is unclear whether the Defendants' failure to raise this argument in their prior appeals was the result of inadvertence or tactical reserve and procedural gamesmanship. Either way, we decline to address their challenge now. During Defendants' prior appeals, they simultaneously challenged the contempt order, the entry of default judgment, the final judgment award, and--again--the preliminary injunction itself. All of the ingredients for the present appeal were at hand, and yet Defendants declined to make their argument at that time. Perhaps, they opted to await our decisions and see how they fared, and when they realized that their original recipe had failed to impress, they used the very same ingredients to cook up a collateral challenge to those decisions by appealing an order entered at our behest.

Whether or not Defendants intentionally delayed making this argument, the argument was available only because of Defendants' default and continued intransigence in the District Court. We thus decline to allow them to profit from that conduct, given that they are raising this argument only at this late date. See In re Cellular, 539 F.3d at 1155 ("Permitting a case to proceed to a decision on the merits before asserting a previously available defense undermines the integrity of the

judicial system, wastes judicial resources, and imposes substantial costs upon the litigants." (internal quotation marks and citations omitted)); 18B Wright & Miller, Fed. Prac. & Proc. Juris. § 4478.6 (2d ed.). Although the present challenge might have posed a question for our consideration had Defendants raised it in a timely manner, its current deployment reeks of an attempt at re-litigation.

Defendants seek to circumvent this straightforward result in two ways. First, they contend that they had to wait until the revised contempt order issued before raising this argument because only then was contempt entered to coerce compliance with an expired order. Second, they argue that the issue is a "jurisdictional" one and, therefore, may be raised at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." (quoting United States v. Cotton, 535 U.S. 625, 630 (2002))). We find neither justification persuasive.

Defendants' first parry misses the mark. During Defendants' prior set of appeals, they were subject to a contempt order and continuously escalating fines even though the underlying preliminary injunction had "expired" as a result of

their default.  We affirmed the contempt order and remanded "for the sole purpose of directing the district court" to set a total cumulative liability figure.  Biolitec II, 780 F.3d at 429 (emphasis added).  Thus, the Defendants' "expired order" argument was as available to them at the time of their prior appeals as it was after the district court capped the escalating fines, per our direction.  Nothing about the disposition of the prior appeal could change that simple fact.  Defendants had both the incentive and the opportunity to raise that issue with this Court and failed to do so.[1]

Defendants' second, "jurisdictional" argument is equally unavailing.  "'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.'"  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 90 (1998) (quoting United States v. Vanness, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)).  The problem is that "[c]ourts--including [the Supreme Court]--have sometimes

_____

[1] Nor do we imagine the Supreme Court would be particularly impressed with this argument.  In petitioning the Court to review our decision in Biolitec II, Defendants raised precisely this point.  Petition for a Writ of Certiorari, No. 15-69, 2015 WL 4319585, at *15 n.21 (July 1, 2015) ("Biolitec has appealed the Remand Order on the ground that the Preliminary Injunction expired by its own terms upon entry of the Default Judgment and was no longer in effect when the Remand Order was entered on April 24, 2015.").  That petition failed.  136 S. Ct. 535.

mischaracterized claim-processing rules or elements of a cause of action as jurisdictional limitations, particularly when that characterization [is] not central to the case, and thus [does] not require close analysis." Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 161 (2010). Such "drive-by jurisdictional rulings" can confuse the distinction between "true jurisdictional conditions" and "nonjurisdictional limitations on causes of action." Id; see also Arbaugh, 546 U.S. at 511 ("Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief--a merits-related determination." (quoting 2 J. Moore et al., Moore's Federal Practice § 12.30[1], p. 12-36.1 (3d ed. 2005)).

To curb this practice, the Supreme Court has "evince[d] a marked desire to curtail" such flippant use of the term in recent years. Reed, 559 U.S. at 161. Courts (and litigants) have been encouraged to use the term jurisdictional "only when it is apposite." Id. Heeding this admonition, we must proceed with caution and take care not to indulge any party's mere self-serving characterization.

The question of contempt jurisdiction is a complex one. But while the boundary between a court's jurisdiction to order contempt and the merits of that court's contempt order may be difficult to discern at times, Defendants' argument fails to qualify as jurisdictional under any fair reading of the law.

The Supreme Court has explained that "'[j]urisdiction' refers to 'a court's adjudicatory authority.' Accordingly, the term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating that authority." Id. at 160-61 (emphasis added) (internal citations omitted) (quoting Kontrick v. Ryan, 540 U.S. 433, 455 (2004)); see also Bowles v. Russell, 551 U.S. 205, 212-13 (2007); Scarborough v. Principi, 541 U.S. 401, 414 (2004).

Accepting this premise, Defendants' argument would appear to be a challenge to the legal propriety of the revised contempt order, not the district court's jurisdiction to issue that revision. This is because the court's jurisdiction to hold a party in civil contempt would spring from its jurisdiction over the action itself. "A district court's authority to issue a contempt order derives from its inherent power to 'sanction . . . litigation abuses which threaten to impugn the district

- 13 -

court's integrity or disrupt its efficient management of [case] proceedings." Biolitec II, 780 F.3d at 426 (alterations in original) (quoting United States v. Kouri-Perez, 187 F.3d 1, 7 (1st Cir. 1999)). While "a proceeding in criminal contempt is a separate and independent proceeding at law, with the public on one side and the respondent on the other," "[p]roceedings in civil contempt are between the original parties and are instituted and tried as a part of the main cause." Parker v. United States, 153 F.2d 66, 70 (1st Cir. 1946) (emphasis added); see also Ramos Colon v. U.S. Atty. for Dist. of P.R., 576 F.2d 1, 5 (1st Cir. 1978) ("Strictly a remedial action, civil contempt arises out of the main suit and . . . is aimed at restoring the parties to the positions they would have held had the order been obeyed." (emphasis added)).[2]

In other words, the court's jurisdiction to impose civil contempt would run concurrent with the court's subject-matter jurisdiction over the action. Cf. Lewis v. S.S. Baune, 534 F.2d 1115, 1121 (5th Cir. 1976) ("[A]ll courts . . . have inherent power, within certain limits, to control the conduct of

---

[2] Criminal contempt, on the other hand, is a "crime in the ordinary sense." United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 826 (1994) (quoting Bloom v. State of Illinois, 391 U.S. 194, 201 (1968)).

- 14 -

the parties who have subjected themselves to the jurisdiction of the courts. . . . However, merely because the court has power, it does not necessarily follow that any and all exercises of such power are proper."). Although a movant would need to demonstrate the elements of civil contempt, such as the contemnor's "ability to comply with the order" or the fact that the contemnor actually "violated [an] order," Hawkins v. Dep't of Health & Human Servs., 665 F.3d 25, 31 (1st Cir. 2012), these requirements would mark the proper exercise of the contempt authority, not count as jurisdictional prerequisites.

This view recognizes the contempt power as an inherent aspect of the federal courts' authority over cases. In establishing the lower federal courts, the Judiciary Act of 1789 confirmed this power and necessarily vested the courts with it. See Green v. United States, 356 U.S. 165, 179 (1958), overruled in part on other grounds by Bloom v. State of Illinois, 391 U.S. 194, 201 (1968); Anderson v. Dunn, 19 U.S. 204, 227 (1821) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose . . . submission to their lawful mandates . . . ."). "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of [the

contempt] power."  Ex parte Robinson, 86 U.S. 505, 510 (1873).

Thus, if the court possesses subject-matter jurisdiction over an

action, it would seem that it must possess civil contempt

jurisdiction in equal measure to see that action through.

The trouble arises in attempting to categorize the

statutory limitations that Congress has imposed upon that power.

"In 1831, Congress first enacted the statute that restricted the

circumstances under which contempt sanctions could be employed--

restrictions that today are embodied in 18 U.S.C. § 401 . . . ."

Armstrong v. Guccione, 470 F.3d 89, 106 (2d Cir. 2006).  With

§ 401, Congress limited the contempt power to three classes of

cases, including disobedience to the court's "lawful writ,

process, order, rule, decree, or command."  See Robinson, 86

U.S. at 511; 18 U.S.C. § 401(3) ("A court of the United States

shall have power to punish . . . such contempt of its authority

. . . as . . . [d]isobedience or resistance to its lawful writ,

process, order, rule, decree, or command.").[3]  The question is

---

[3] "[Section] 401's use of the term 'punish' must be viewed
in the context of its predecessor statutes, which plainly
included within the meaning of 'punish' a court's coercive civil
contempt power, as well as the power to sanction a contemnor
criminally."  Armstrong, 470 F.3d at 105.

whether, and to what extent, these statutory limitations are jurisdictional in nature.

On the one hand, the Supreme Court occasionally has referred to § 401 in jurisdictional terms. See, e.g., Cammer v. United States, 350 U.S. 399, 405 (1956) ("We see no reason why the category of 'officers' subject to summary jurisdiction of a court under § 401(2) should be expanded beyond the group of persons who serve as conventional court officers and are regularly treated as such in the laws."). Indeed, in Ex parte Robinson, the Supreme Court vacated a contempt order that disbarred the contemnor, and the Court stated that "the question . . . [was] not whether the court erred, but whether it had any jurisdiction to disbar [the contemnor] for the alleged contempt." 86 U.S. at 511. Because the statute limited the implements available to the court to fines or imprisonment, the Supreme Court held that disbarment exceeded the district court's jurisdiction. See id. at 512-13.

On the other hand, the Supreme Court has cautioned in more recent years that Congress must clearly express that a limitation is jurisdictional in order for the federal courts to interpret it as such. Reed, 559 U.S. at 163. And, in rare exceptions to that rule, a statute will only be "ranked as

jurisdictional absent an express designation" if the statutory limitation is "of a type that [the Supreme Court] ha[s] long held [does] 'speak in jurisdictional terms' even absent a 'jurisdictional' label." Id. at 168. Any of the Supreme Court's "unrefined dispositions" of jurisdiction "should be accorded 'no precedential effect' on the question whether the federal court ha[s] authority to adjudicate [a] claim." Arbaugh, 546 U.S. at 511 (quoting Steel Co., 523 U.S. at 91).

Here, the statute does not speak in explicitly jurisdictional terms and only Robinson examines the nature of the limitations in any meaningful measure. As such, it might be more appropriate to read § 401 as setting limits upon the proper exercise of the court's contempt power rather than as setting limits upon the court's underlying contempt jurisdiction.

Yet, we need not resolve this difficult question today because Defendants' appeal would fail to qualify as jurisdictional even if we were to assume that § 401 sets out jurisdictional limits. There is no question that the district court had (and retains)[4] jurisdiction over the present action.

---

[4] The district court retains jurisdiction over the action so long as its judgment remains unexecuted. Fafel v. DiPaola, 399

In addition, there is no question that the alleged contempt falls within one of the three classes delineated by § 401 (the alleged violation of a lawful order) and that the court's coercive sanctions fall within the category of sanctions permitted by § 401 (fines and imprisonment). The only question raised by Defendants' appeal is whether the elements necessary to sustain a finding of civil contempt--namely, the ongoing, actual violation of a lawful order--were satisfied. But this is a question about the merits of the order, not whether it fell outside § 401's purview altogether. See Robinson, 86 U.S. at 511 (distinguishing between the question of "whether the court erred" in finding that "contempt was committed" and the question of "whether [the court] had any jurisdiction" to use disbarment as a sanction). Such a challenge does not become "jurisdictional" just because Defendants call it so.

Defendants' cited authorities do not hold otherwise. In Shillitani v. United States, for example, a witness was confined in order to coerce him into answering questions for a grand jury. 384 U.S. 364, 370 (1966). Once the grand jury was discharged, however, the "contumacious witness c[ould] no longer

F.3d 403, 411 (1st Cir. 2005) ("[E]nforcement jurisdiction . . . extends . . . as far as required to effectuate a judgment.").

- 19 -

be confined since he then ha[d] no further opportunity to purge himself of contempt." Id. at 371. Having lost "the ability . . . to comply with the court's order, . . . the rationale for civil contempt vanishe[d]." Id. at 371-72. This challenges the merits of continued contempt, not the court's jurisdiction. See also FTC v. Verity Int'l, Ltd., 443 F.3d 48, 70 (2d Cir. 2006) ("The district court . . . no longer requires [the defendants] to do the act that the contempt sanctions coerce them do to. Thus, the sanctions must be vacated."); Consol. Rail Corp. v. Yashinsky, 170 F.3d 591, 596 (6th Cir. 1999) (holding that, because the coercive order "no longer serves a purpose," the contumacious party was "no longer . . . in active contempt of court for refusing to comply"). Whether a party violated an order, whether coercion continues to serve its purpose, and whether the party retains the ability to purge[5] are all questions about the merits of the court's contempt decision.

In fact, the only case cited by Defendants that analyzes the question in clearly jurisdictional terms bolsters

---

[5] In order to remain coercive rather than punitive, the contemnor must retain the ability to purge the violation so that he "carries the keys of his prison in his own pocket." Bagwell, 512 U.S. at 828 (quoting Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 442 (1911)).

our view. In EEOC v. Local 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, the Second Circuit held that "[a] court does not have inherent power to enforce an order that has expired." 76 F.3d 76, 80 (2d Cir. 1996). In that case, however, the "order" was a consent decree. Id. The decree, entered in 1980, expired in three years unless the Equal Employment Opportunity Commission ("EEOC") moved for an extension within that time. Id. at 81. Thus, after three years without EEOC intervention, the purpose of the decree was satisfied and the parties were "released from the court's continuing jurisdiction." Id. In other words, "the court's enforcement authority expired when the decree expired." Id. at 80 (emphasis added). Because the court no longer possessed jurisdiction over the action at all, it is no surprise that the court lacked any "inherent power" to hold one of the parties in contempt based on a "violation" a decade later. Id. at 78.

The case at bar bears no resemblance. In this case, the district court continues to maintain jurisdiction over the action, Defendants violated the terms of the underlying order prior to its "expiration," and the court took action to rectify the situation within the context of an ongoing case. We affirmed, and Defendants now raise a belated challenge

implicitly foreclosed by our prior decisions. In such circumstances, Defendants' appeal must fail.[6]

### III. Conclusion

"The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience." Maggio v. Zeitz, 333 U.S. 56, 69 (1948). Defendants in this case, who have repeatedly thumbed their nose at the district court, "are not unwitting victims of the law. . . . They knew full well the risk of crossing the forbidden line." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949). Defendants cannot now hang their hat on a theory borne of their own defiance and delay. For the foregoing reasons,[7] we DENY the appeal.[8]

---

[6] Defendants raise a last-ditch argument in the event we find, as we do, that the issue is not jurisdictional and that they are deemed to have had the opportunity to raise the issue earlier. Defendants argue that waiver is a matter of discretion, and they urge us to make an exception in this case. In re Net-Velázquez, 625 F.3d 34, 41 (1st Cir. 2010). Needless to say, this is not a case where "the equities heavily preponderate in favor of such a step," id. (quoting Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995)), and so we would decline to exercise our discretion to hear the appeal regardless.

[7] Although we need not reach the merits of Defendants' appeal, we do regard their theory--which they base on Shillitani, Verity, and Yashinky--with some skepticism. The injunction set out a temporal limit ("in effect until . . .

- 22 -

final judgment"), but it also assumed compliance with its substantive terms ("Defendants shall not carry out the proposed 'downstream merger'").  The order as a whole served one purpose: keeping assets available to satisfy a judgment.  United States v. Christie Indus., Inc., 465 F.2d 1002, 1007 (3d Cir. 1972) ("The language of an injunction must be read in the light of the circumstances surrounding its entry . . . [such as] the mischief that the injunction seeks to prevent."); see also Ohr ex rel. Nat'l Labor Relations Bd. v. Latino Exp., Inc., 776 F.3d 469, 480 (7th Cir. 2015) ("[A]ny other interpretation . . . would eviscerate the effect of [preliminary injunctions], as a party could simply continue its violation . . . long enough that the district court order expire[s] by its own terms.").

Nor need we delve deeply into other equitable grounds upon which the appeal might be barred.  Sapoundjiev v. Ashcroft, 376 F.3d 727, 729 (7th Cir. 2004) ("Someone who cannot be bound by a loss has warped the outcome in a way prejudicial to the other side; the best solution is to dismiss the proceeding.").

[8] Because the order stands, we do not decide here what Defendants might owe even if the contempt order expires by law or by purge.  The liability cap was not a fixed, determinate fine set out in advance, but rather a ceiling on accumulated, past due fines.  When a court imposes ongoing fines at regular intervals, these fines--like civil imprisonment--"exert a constant coercive pressure."  Bagwell, 512 U.S. at 829.  "[O]nce the jural command is obeyed, the future, indefinite, [monthly] fines are purged."  Id. (emphasis added).  Presumably, Defendants' uninterrupted disregard of the contempt order cannot render collectable past due amounts punitive.  See id. at 840 n.* (Scalia, J., concurring) ("The per diem fines . . . were in most relevant respects like conditional prison terms[,] . . . the penalty continued until the contemnor complied, and compliance stopped any further punishment but of course did not eliminate or restore any punishment already endured." (emphasis added)).  Of course, the district court may still "reassess the fine amount if Defendants come into compliance."  See Biolitec II, 780 F.3d at 428.

- 23 -